Oral argument not to exceed 15 minutes per side. Mr. Shad for the opponent. Good morning, Your Honors, and may it please the Court, I'm here this morning representing David Payne, who is the defendant in the court below, and I'd like to reserve four of my minutes for rebuttal. All right. Your Honors, there's only one issue which is before the Court this morning. Officer Comstock thought that the appellant, David Payne, was dealing in drugs. As he admitted at the suppression hearing, he had no basis to be able to enter Mr. Payne's home, so he invented one. And he didn't invent a very good one. And as a I think it's clear, you know, from the way that the suppression hearing came out in this case, that there was no real emphasis, although there was this discussion of a parole violation or a, I believe the state of Ohio calls it something different than parole, it's actually a post-release control. It's sort of akin, it sounds like, to supervised release in the I can tell, because there's a separate violation hearing that you go through if you get caught in those kind of things. But that the Officer Comstock tried to take what could have been this post-release control violation of another person that was located inside the home, and then use that as a ruse to conduct a criminal investigation of appellant Payne so that he could find evidence of drug trafficking. And that's borne out through both Officer Comstock's testimony, the probation officer's testimony, and what frankly they were doing on the day that they conducted the search. And again, we have a search here without any warrant of a house that admittedly is being rented at that point solely by appellant Payne. He's the only one that filed the addendum to the lease to extend the period of time. He's the to go into the house. Well, let's take Comstock out of the equation for a while. Did Kneekamp have a right to go into that house? No. And let me tell you why. Under one of two different theories. Number one, if he was trying to prove, let's assume that he was trying to prove that the girlfriend was violating the conditions of her post-release control by living in a different location. She was. Well, yes. And let's assume that that was his basis. I'm not even going to concede that that was actually his basis for doing it, but let's assume for a moment that that's the case. We have evidence from his own testimony at the time of this press hearing. It's either on page 84 or 85, page ID, 84 or 85, where he says that she admitted that she was living at that house or that residence prior to any search. So if he wanted to prove, if his idea was, I need to prove that she was living at that house, he has his discussion with the mom where she's never there. He has the fact that he sees her on multiple occasions going inside and outside the house and driving a car. No, my mom's just sleeping when I get home. Well, that's not exactly what I said to the officer. I said, yeah, I spend time there, but I don't live there. And besides, I started crying. I was very upset. I mean, the real evidence is to go inside and show that all her clothes are there. And if in fact that's what they were actually doing, then yes, that would be the case. But it's interesting, the probation officer didn't perform the search in this case. It was Officer Comstock that performed the search in this case. And what was Officer Comstock performing the search for? His own evidence. He was the one that even manufactured. There's no evidence that the probation officer was really even looking for this person, actively looking for them, other than the fact that he had stopped by the mom's house and that she wasn't there any time he was there. Let's assume that you're entirely correct. This was a complete ruse. Comstock found a way to go inside. Do you have a case that says that you can't do that? I have a whole set of cases that say that you can't do that, and that's the stocking horse doctrine. And I cited to that in my brief. I think there's Likens, Gallaudet, and one other case. But a police officer cannot use probation as a stocking horse to pursue a criminal investigation. And that would be a violation of the Fourth Amendment. And I know my colleague has indicated that the stocking horse doctrine might not survive some more recent Supreme Court cases. I would take objection to that. There's three kind of Supreme Court cases that we talk about in our briefs. There's the Griffin case that I rely upon, there's the Samson case, and then there's the Knights case that all go to this issue of being able to look inside a probationer's or parolee's home. My colleague wants to argue that Knights and Samson somehow are a break from Griffin. And in fact, they're just part of an ongoing continuum. And the difference when you're looking at this is, what are the restrictions that are placed upon the state in terms of looking at the probationer or parolee? In Knights and in Samson, they were looking specifically at California law. And California law says that if somebody is on parole or probation, we can go inside their house whether we have any reason to or not. With or without reason is the actual language that's used in both of those Supreme Court cases. This court has found in the Likens case and the Loney case and in the, I can't think of the name of the case right now, the one that starts with a G, but I'll look it up during my, but in those three cases, they looked at Ohio statute is different. Ohio statute requires reasonable suspicion even if the person's on parole or post-release control. It's a huge difference because it goes to what you agree to when you're on one of these conditions. When they, specifically in the Samson case, the Supreme Court looked at the fact that in that case it was a parole situation. And they said, well, that person had a choice. They could either ride out all of their time in prison, in which case they have a very little, if any, Fourth Amendment right, or they can choose to go on parole, in which case they have to agree to these conditions and therefore they've made this choice and they've made these choices to these conditions. Again. Counsel, your comment relative to Griffin and Knight's, this, Knight's says, because our holding rests on ordinary Fourth Amendment analysis, it considers all the circumstances of a search. There is no basis for examining official purpose. We have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers. And they cite to Wren, which is one of the car cases where you can say your taillight was out when you really want to look for drugs. Yes. So there is a, there's a difference between special needs cases and this was not a special needs case. Well, I don't know how it couldn't be a special needs case, your honor, because again, we, this totality of the circumstances and, and, and, and there's that continuum of those three cases where it talks about the totality of the circumstances. One of the large circumstances that are relied upon in both Samson and in Knight's is what were the conditions of probation or parole? And the conditions of probation and parole in both of those cases was we can go in with or without any cause. Ohio doesn't have that standard. It's a huge difference between these cases. But you, it allows, if there's reasonable grounds to believe that the felon is not abiding by the law or otherwise is not complying with the terms and conditions of the felon's conditional pardon. And that's exactly what she wasn't doing. She wasn't complying with the terms and conditions of her parole. Well, that, let's assume, again, let's assume that that is true. Let's assume that that is true. Then the issue becomes on what basis do they have to search Mr. Payne's home once she admits to it prior to any search? And there's two things here. One is they don't give her a choice. They arrest her for the parole violation when she is outside the home. There's no question. And what they tell her is, we need to go inside. They don't give her a choice. They don't tell her, we're taking you down to the station. They tell her, we need to go inside. Then on page 84, we have the officer that says, yes, she admitted to us that, she admitted to us that she was living there prior to any search. So then the question becomes, on what basis do you do a search of a third party's home after you already have all of the evidence you need for the post-release control violation? Well, whose determination is that you have all the evidence you need? What's wrong with a belt and suspenders approach? Well, I don't know what else you could need at that point. Her clothes, her things. We've got her admission, which is always less than that. She's always denied. Yeah. And the standard is even less. You know, I can't speak to Ohio law, but assuming the supervised release standard in the federal system, it's only a preponderance of the evidence. So you have the fact that she's never at the mom's home. You have the fact that she is seen frequently going in and out of the place. You have the fact that she's driving in that car, and you have the fact that she admitted to it. Do we really... Again, okay, let's say the probation officer said, even with all that, I need a little bit more. He doesn't do the search. It's the officer that's looking for the drugs that does the search. And that's the problem here. And I did want to get to... The Karnes case is the one that I was thinking about. This is a 2002 case. And this comes out after nights, where the government claims that special needs of law enforcement justify an otherwise illegal search and seizure. A court must look to the actual motivations of the individual officers. That's a special needs case. There can only be a special needs case because of Ohio law in this case. That's the difference here. You can't throw out... Oh, my time's up. Can I use a minute of my rebuttal time? Yes, you can do that. Take away a minute. Thank you. Thank you. You can't ignore Ohio law when you're doing this evaluation, even when you look at totality of the circumstances. It's not like the special needs doctrine is thrown out the door once nights comes along and once Samson comes along. Samson and nights are just merely a continuation of what Griffin already set up, which is that totality of the circumstances. You need to have... Special needs is you need to have more than nothing to get in the door, and especially when it's a third party in this case, not even the parolee. Thank you. Thank you, Your Honor. May it please the court. My name is Brent Tabachi. I represent the United States in this matter. Assuming for a moment that Mr. Payne has actually preserved this issue before this court and setting aside the issues concerning the standard of review, the substantive argument that he's making here is foreclosed. There was simply no error that the district court committed. Both this court, the Supreme Court, and other circuits have routinely affirmed, as appropriate, searches similar to the one that occurred in this case. And I'd point specifically to this court's decision in United States v. Herndon. In that case, on extremely similar facts, you had a parole officer go out to a home to conduct a search based on a parole condition. And based on that parole condition, conducted a search of a computer, and during the search of the computer, found child pornography. On appeal in that case, the defendant raises this stalking horse issue and says that the search doesn't comply with Griffin. This court agreed that the search didn't comply with Griffin in that case because of the types of the search conditions, but then went on and said that, look, Griffin is not the only way that you can justify a parole search or a probation search, even if it's premised upon a probation condition, which is what happened here. Ms. Ratliff, who is on post-release control, which is akin to parole in the state of Ohio, she has a condition that requires her to live at a certain residence and to notify her parole officer where she's residing. And jumping back to the Herndon decision, the court says that we pause to note that the object of the suspicion, defendant's potential violation of the terms of his probation, as opposed to a generally applicable criminal statute, does not impact the availability of the Nights framework. This court has specifically held Nights is applicable to a situation exactly like this. And then this court, seven years later in Likens, re-adopted that exact same analysis in a decision actually written by Judge Clay. There's just simply no case law supporting this dichotomy that the defendant is attempting to draw here that the special needs doctrine is the only basis upon which this search can be affirmed. In fact, if the court looks at Nights itself, Nights made clear that Griffin addressed a very narrow issue, whether under the circumstances present in that case, whether the parole system or probation system as a whole complied with the Fourth Amendment and whether there was reasonable grounds to justify the search. What the court did not address in Griffin's, and specifically left reserved, was whether or not the Fourth Amendment as a whole, general Fourth Amendment jurisprudence, could be used to render that search proper. And the court answered that question in the affirmative in Nights. And in that case, it called dubious logic that the special needs doctrine was the only basis upon which you could justify a probation and parole search. It said, no, general Fourth Amendment analysis is appropriate. And as Judge Guy indicated earlier, Nights specifically rejected this notion that we have to look at the official purpose of the search, whether it's for a probation violation or whether it's for an investigatory purpose. The court doesn't draw those distinctions. It doesn't look at the official purpose. And jumping ahead to Sampson, a case following Nights in which this court, in which the Supreme Court took a step further so that there was even no suspicion required to conduct a search of a parolee under the circumstances of that case, did a straight analysis under the Fourth Amendment as to whether or not the parole search was proper and then dropped a footnote near the end of the opinion saying, well, we don't even need to address Nights because we found that the parole search was proper, or excuse me, we don't need to address Griffin because the parole search was proper under our general Fourth Amendment's jurisprudence. It's evident based on this court's decision and the overarching case law that this search comported with the general Fourth Amendment requirements. Now, Mr. Payne, through his counsel, questions why, once Ms. Ratliff made the admission, as to why the parole officer would go ahead and authorize the search. Well, as the court has indicated, individuals often will deny that they made the admission. And interestingly, at the suppression hearing below, and I draw the court's attention to the transcript, which is at Record 25, page 86 through 88, where defense counsel specifically questioned the probation officer, or excuse me, the parole officer, as to why he didn't write down the admission in his report and, by extension, questioning whether or not Ms. Ratliff had even made the admission in the first place. I would also note, too, that upon entering the house, and this is set out at Record 85, the same transcript, that when officers entered the house, there was marijuana in plain view on the table. So now you have an individual who is a parolee living in a location they're not supposed to be, and there's marijuana in plain view. Another issue that defense counsel has brought up is the identity of who it was that performed the search. First of all, the Fourth Amendment makes no distinction between whether or not it was the parole officer or whether it was Officer Constock who actually performed the search. But factually, he's also leaving some doubt in that the probation officer, Nijkamp, specifically testified that he was the one that authorized the search and then instructed the other law enforcement officer to help him perform the search. And they explained why that happened. This investigation took place in Bellefontaine. It's a small community. There's only a small number of probation officers and police officers in the area. And as Detective Constock testified, there's often mutual support provided for one another. And as a practical matter, it doesn't matter under Fourth Amendment jurisprudence who conducted that search, but as a factual matter, it was still authorized by the parole officer in this case. Unless the court has any questions concerning the substance of the claim, I would like to turn to the standard of review that's appropriate in this case. It's the position of the United States that this argument that the defendant is making here, this Griffin analysis and special needs doctrine, well, under the case law, it's foreclosed. But in any event, it was not raised before the district court. Before the district court, the sole issue that was raised addressed and dealt with whether or not there were sufficient facts to believe that Ms. Ratliff was actually living at that residence, thereby triggering application of the probation or parole condition that authorized the search. Well, to be fair, the issue was raised. It may not have been a reference to the Griffin case. The case may not have been expressly invoked or stated, but the issue itself was raised before the district court. Wouldn't that be enough? No, Your Honor. It was a challenge to the search itself. This court is, the case law is replete with instances in which an individual has challenged, for instance, the basis of a search, the substance or the admissibility of a statement, but asserts one ground before the district court and then an alternate theory before this court. Before the district court, there was not a single mention of Griffin, special needs, stalking horse. The issue that was raised had to do with factually whether or not there were sufficient facts to justify the search. And additionally, I would note that the language that Mr. Payne used before the district court was the language of knights in the general Fourth Amendment jurisprudence, and in fact framed the question this way in his brief, which is at Record 26, page 127, that the question before the court is whether the officer's conduct was an objectively reasonable search. That's the language of knights. That is not the language of Griffin or the special needs doctrine. And if you juxtapose that with the defense reply brief in this case before the district court, the government raised Samson, raised Knights, totality of the circumstances, the reply brief wasn't, well, wait a second, Judge, that's not what applies here. This is a Griffin case. The response was that the government factually hadn't met its burden. Under those circumstances, the government would submit that the defendant has waived the argument that he's submitting before this court. And this court has treated waivers differently. In some instances, it is found that the waiver acts as a, when I say jurisdictional bar, I don't mean it in the constitutional sense, but in a bar to reviewing a claims processing type rule that this court typically would not reach out and grab it. There are cases, though, where the court has reviewed it for plain error. Whether under either standard here or if the court would reject the government's position that this argument was preserved, even under de novo standard, the United States submits that the district court committed no error. And unless the court has additional questions for the government, we would simply ask that the district court's judgment be affirmed. All right. Thank you. Let me first address this waiver standard of review argument very briefly. Again, and I've argued that the Knight's case, the Samson case, and Griffin's are all a continuum, and they all reference each other. And what's perplexing about this is if, let's say the issue was a Miranda issue, and I had cited two cases from this circuit that had used Miranda standards and done a Miranda analysis, but I didn't cite to the Miranda case. Somehow then under this theory, I would have waived my Miranda claim. And that's simply not the case. The Knight's case, which is cited to in the district court opinion, the Samson case, which is cited to in the district court opinion, the Knight's case, which was cited to by both parties in the courts below, all rely in large part on the Griffin and further the Griffin standard. That's where the genesis is. So to say that somehow we've waived it by going back one case to begin the analysis, that that's our argument and we've waived it, I think, is not a fair representation of what we're doing here this morning. And the district court sort of by implication acknowledged that. He addressed the issue, actually. Absolutely. Absolutely. With regards to Herndon, I do think that Herndon does have effect in this case, and it furthers my argument because in that case, the Herndon case had a specific allowance in the person's release that said, yeah, probation officers can look at your computer at any time. So the rule was already there. They didn't need to come up with reasonable suspicion or any other standard to get to the point where a probationer can take a look at the computer. So it's clearly on point because in Herndon there was that rule. In our case and in Ohio, there is not that rule. That's the difference, and that's the difference in the Samson case as well. Likens that they rely on is a supervised release case. Again, it's a federal supervised release case, but it gave the probationer specific allowance that the defendant agreed to to overcome that Fourth Amendment issue. And that is the crux of the issue here, and it's what differentiates this case from— How do you get over the hurdle that there is a statute, it requires reasonable cause, and they had reasonable cause to believe that she was violating her parole? Not only did they have reasonable cause, but they'd already proven it. And that's what we're getting to, is that number one, they'd already proven it, and number two, that's not the reason they conducted the search. And that's what gets us to the stalking horse doctrine. Well, under that logic, though, if somebody confessed to a crime, does that mean you couldn't get a search warrant to get further evidence of the crime? No, I mean, certainly I can come up with all kinds of scenarios where that wouldn't be enough. I agree with you, Your Honor. But in this case, that wasn't all that they had. And I see that I have four seconds left. Unless there are any other questions, we would ask that you were— And for the stalking horse, your best case? It's the case that I keep not coming up with the name of that starts with a G that's in my brief. I'm sorry. Is that Penson? What's that? Sorry, about Penson? No, no, no. I probably have it right here. But it's in my initial brief, and I actually read it to Judge Guy in my initial argument, that quote from there. So I apologize. I don't know where my head's at this point. Thank you, Your Honor. Thank you very much.